**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES S. SPARKMAN; MERCURY
SOLAR PTO, AMANDA MCKEOUGH,
TRUSTEE,

        *Petitioners-Appellants,*

        v.

COMMISSIONER OF INTERNAL
REVENUE,

        *Respondent-Appellee.*

No. 06-71476

Tax Ct. Nos.
8400-03
8650-03

OPINION

Appeal from a Decision of the
United States Tax Court

Submitted November 7, 2007*
Honolulu, Hawaii

Filed December 10, 2007

Before: Diarmuid F. O'Scannlain, A. Wallace Tashima, and
Milan D. Smith, Jr.,
Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

---

*The panel unanimously finds this case suitable for decision without
oral argument. *See* Fed. R. App. P. 34(a)(2)

16167

## COUNSEL

Paul J. Sulla, Jr., Laupahoehoe, Hawaii, for the petitioners-appellants

Eileen J. O'Connor, Assistant Attorney General; Jonathan S. Cohen, Michelle B. Smalling, United States Department of Justice, Tax Division, Washington, D.C., for the respondent-appellee.

## OPINION

MILAN D. SMITH, JR., Circuit Judge:

Petitioner-Appellant James Sparkman appeals the decision of the Tax Court upholding the Commissioner's notice of deficiency with respect to tax years 1996 through 2000. *See Sparkman v. Comm'r*, T.C. Memo 2005-136 (2005). He objects to the Tax Court's ruling that one of his business entities, Mercury Solar PTO, lacked economic substance and should be disregarded for income tax purposes. He contends that the Tax Court improperly excluded his amended 1997 and 2000 tax returns from evidence admitted, erred in holding that he had not substantiated several depreciation and charitable deductions, and erred in calculating his income for 1996, 1997, and 1999. Finally, he argues that the Tax Court erred in imposing accuracy-related penalties under § 6662(a) of the Internal Revenue Code (I.R.C.).[1] We reject each argument, and affirm the decision of the Tax Court.

### I.   Facts and Procedural History

James Sparkman has sold solar water heating systems to homeowners since 1983. Until 1993, Sparkman operated his business as a sole proprietorship, under the registered trade name "Mercury Solar."

---

[1]Unless otherwise indicated, all references are to the Internal Revenue Code of 1986, title 26 of the United States Code, as amended, and as in effect during the years at issue.

### A.  Hawaii Environmental Holdings (HEH)

In 1993, Sparkman purported to create and transfer his business to Hawaii Environmental Holdings ("HEH"), styled in its formation document an "Unincorporated Business Organization." The formation document, entitled "Contract and Declaration of Unincorporated Business Organization," provides that Sparkman (identified as the "Exchanger or Exchangers") will convey the Mercury Solar business to HEH in exchange "for twenty-five dollars of silver, Certificates comprising a total of one hundred units, and other full and adequate consideration." The formation documents also provide for a "Trustee" who will be responsible for the "exclusive management and control of [HEH's] property and business affairs without any consent of Certificate holders." The original such "Trustee" was "Lee Allan Hansen," who is not otherwise identified in the record. The trustee immediately appointed Sparkman as "Agent" and "President" of HEH, with authority "to open bank accounts, act as the official authorized signature on said bank accounts and to operate the company to the same extent as if he were the owner." Two months later, Hansen appointed Amanda Porter,[2] at the time Sparkman's wife, to be trustee. In 1996, Porter was removed as trustee, and Hansen appointed Sparkman himself and Cynthia McNeff as trustees. McNeff was removed as trustee the following year, and in 1999, Hansen was removed, leaving Sparkman as the sole trustee of HEH.

### B.  Mercury Solar PTO

In 1994, HEH purported to transfer its interest in the Mer-

---

[2]During the period in question, Amanda Porter used a number of other names, including Amanda McKeough, Amanda J. McKeough-Porter, Amanda Jane Porter, Mandy Wildman, Mandy Porter, Amanda Jane Howat, and Amanda Sparkman. For simplicity's sake, we will follow the convention adopted in the Tax Court's opinion of referring to her as "Porter."

cury Solar business to Mercury Solar PTO, styled in its formation documents a "Pure Trust Organization," in exchange for units in Mercury Solar. Except for designating Mercury Solar a "Pure Trust Organization" and entrusting "exclusive management and control" of the entity with a "Fiduciary Owner" rather than a "Trustee," the formation documents are in almost all respects identical to those of HEH. "J. Clark Atkinson," also not otherwise identified in the record, was initially named as "Fiduciary Owner," but in 1998 Porter was appointed "Trustee," and Atkinson resigned as Fiduciary Owner.

The precise ownership of Mercury Solar PTO is unclear and disputed. The formation documents call for 100 beneficial units, which were initially given to HEH in return for the Mercury Solar business. These appear to have been immediately transferred to Sparkman. The record, stipulated to by both parties, contains a "Certificate Record" that records the assignment of one share each to William Bright, William Montgomery, and Myron Thompson. In testimony before the Tax Court, Porter described the first two entries of assignment as "administrational error[s]" but testified that the assignment to Thompson, an employee of Mercury Solar, was valid. According to Porter, 50 units are owned by HEH, 49 by Sparkman, and one by Thompson. When Thompson himself was asked during testimony whether he was "aware that [he] had a share," he responded, "I am now," but said that he did not know "what happened to the share."

## C.   Operation of Mercury Solar and HEH

During the years at issue, HEH purported to sell to customers solar energy produced by solar water heating components on the customer's property. It would purchase this equipment from Mercury Solar PTO, and hire Mercury Solar to install it. In addition to the solar service energy contract with HEH, each customer also received a "beneficiary certificate" entitling him to a beneficial ownership interest in HEH. The HEH

trustee would thereby have the discretion to pass through solar energy tax credits to the customer, and such credits would be reflected on Schedules K-1 distributed to its "beneficiary"-customers. *See generally Hvidding v. Comm'r*, T.C. Memo 2003-151 (describing more fully the transaction in the case of a customer claiming a tax credit for the energy purchased); *Richter v. Comm'r*, T.C. Memo. 2002-90 (same). As Thompson testified:

> Mercury Solar is really just a contractor, it's a solar contractor. It basically was contacted to put solar panels and hot water heaters in homes and that kind of thing. So that's what our function was. HEH had another function of contracting Mercury Solar to do that for the purposes of selling energy and things like that.

HEH had no employees and shared a common office space with Mercury Solar. Mercury Solar did not have a solar contractor's license in its own name, but rather used Sparkman's.

### D.   HECO Payments

According to the parties' stipulation, in 1999 the Hawaii Electric Company (HECO) issued a Form 1099 NEC (Non-Employee Compensation) reporting $195,275 in income earned by Mercury Solar. Regarding these payments, Sparkman later testified:

> I do know that Mercury Solar in its transaction with Hawaiian Electric Company wanted to be paid faster.
> . . . [W]henever someone installs a solar system via the Hawaiian Electric company rebate program either the contractor or the homeowner is entitled to an $800 cash subsidy. However, through its bureaucratic process Hawaiian Electric sometimes doesn't pay anywhere between 120 to 60—six months.

Mercury . . . sought out a factoring company that would take that receivable and pay it in cash . . . . And how it worked was Mercury submitted invoices that it was owed by Hawaiian Electric Company to ABA Funding and ABA Funding took a percentage of the $800 rebate . . . and then HECO sent ABA funding a check made payable to Mercury Solar which ABA Funding cashed . . . .

And apparently mid-1999 ABA Funding or Mercury Solar or HEH decided they wanted the funds directed into the Hawaii Environmental Holdings account instead of the Mercury Solar account.

### E. Procedural History

In 2003, the IRS issued Sparkman a notice of deficiency with respect to the years 1996 to 2000, inclusive. It identified Mercury Solar PTO as "a sham with no economic substance" and accordingly attributed Mercury Solar's income to Sparkman directly. Because the income was attributable as self-employment income to him personally, Sparkman was assessed self-employment tax. The Service adjusted his income to include the $195,275 HECO payment, asserting it to be attributable entirely to Mercury Solar, and hence to Sparkman.[3] It disallowed losses flowing through from HEH to Sparkman as unsubstantiated. Finally, it assessed both late filing (I.R.C. § 6651(a)(1)) and negligent underpayment (I.R.C. § 6662) penalties.

The Tax Court conducted a trial, summarizing the issues for decision as follows:

(1) Whether Mercury Solar PTO should be disre-

---

[3]The Commissioner later conceded that $81,921 of that sum had already been reported on Mercury Solar PTO's 1999 income tax return, leaving only $113,354 at issue.

garded as an entity separate from Sparkman for Federal tax purposes and its net income attributed to Sparkman for the years at issue; (2) whether in 1999 Mercury Solar PTO (and hence Sparkman) had unreported income resulting from certain rebate payments from Hawaii Electric Company (HECO); (3) whether for the years at issue Sparkman is liable for self-employment tax on his earnings from Mercury Solar PTO; (4) whether for the years at issue Sparkman is entitled to claimed losses from a purported business trust, Hawaii Environmental Holdings (HEH); (5) whether Sparkman is entitled to additional itemized deductions, allegedly not claimed on his Federal income tax returns, for interest or charitable contributions; and (6) whether petitioners are liable for additions to tax and penalties.

It admitted into evidence a stipulation by the parties and attached exhibits (including Sparkman's amended returns for 1996 and 1999), and heard testimony from Porter, Sparkman, Thompson, and Joe Miskowiec, identified as a salesman for HEH. When Sparkman tried to enter into evidence his 1997 and 2000 amended returns, the Tax Court excluded them as irrelevant, but encouraged him to attempt to substantiate their contents through relevant evidence. After trial, the Tax Court decided in favor of the Commissioner on all the issues identified above and entered judgment upholding the Service's amended calculation of the deficiency and denying Sparkman's claim for additional deductions. Sparkman appealed to this court.

## II.　Economic Substance of Mercury Solar PTO

**[1]** "It has long been the law that a transaction with no economic effects, in which the underlying documents are a device to conceal its true purpose, does not control the incidence of taxes." *Sacks v. Comm'r*, 69 F.3d 982, 986 (9th Cir. 1995); *see Gregory v. Helvering*, 293 U.S. 465, 469 (1935).

Sparkman contends that Mercury Solar PTO was not a sham organization, but a "legitimate business enterprise." If Mercury Solar PTO has an independent existence, that would mean that the income Sparkman received from it would not constitute self-employment income, and, accordingly, that Sparkman would not owe self-employment taxes on that income.[4]

In reviewing the Tax Court's determination that a transaction lacks economic substance, we review the factual determinations for clear error, and we review *de novo* the correctness of the legal standards applied by the Tax Court and the application of the legal standards to the facts found. *Sacks*, 69 F.3d at 986. Under the clear error standard, we will reverse the Tax Court's findings only when we are "left with the definite and firm conviction that a mistake has been committed." *Wolf v. Comm'r*, 4 F.3d 709, 712 (9th Cir. 1993) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

In evaluating whether Mercury Solar PTO had economic substance, the Tax Court employed a four-factor test derived from *Markosian v. Comm'r*, 73 T.C. 1235, 1243-44 (1980), asking:

> (1) whether the taxpayer's relationship to the transferred property differed materially before and after the trust's creation; (2) whether the trust had an independent trustee; (3) whether an economic interest passed to other trust beneficiaries; and (4) whether the taxpayer respected the restrictions placed on the trust's operation as set forth in the trust documents.

Sparkman does not contest these criteria as probative of economic substance, and the precedent from which they derive

---

[4]Sparkman has not separately challenged his liability for self-employment taxes.

has been cited with approval in this circuit. *See Zmuda v. Comm'r*, 731 F.2d 1417, 1421 (9th Cir. 1984); *Hansen v. Comm'r*, 696 F.2d 1232, 1234 (9th Cir. 1983). This court reviews the Tax Court's application of these factors for plain error. *Sacks*, 69 F.3d at 986.

**[2]** The Tax Court concluded that Sparkman's formation of Mercury Solar PTO and HEH did little to change his relationship to the Mercury Solar business. As "Agent" and "President" of both HEH and Mercury Solar PTO, Sparkman was empowered "to operate the company to the same extent as if he were the owner." As Porter testified, he continued to have day-to-day control of the Mercury Solar business, except during the period when Thompson was operation manager. The business continued under the same name, and even continued doing business under Sparkman's contracting license.

**[3]** The Tax Court next determined that Mercury Solar PTO had no independent trustee. From Sparkman's failure to call Atkinson, the first named "Fiduciary Owner" of Mercury Solar PTO, the Tax Court properly inferred that Atkinson's testimony would not favor Sparkman.[5] Similarly, the Tax Court's finding that Porter was not an independent trustee was not due to confusion regarding the proper role of trustees and agents in a corporate trust, as Sparkman contends. Rather, the Tax Court found that "she had no meaningful role" whatsoever. That Porter testified otherwise does not, in itself, establish that the Tax Court committed clear error. The Tax Court, describing Porter's testimony as "vague, contrived, and non-credible," plainly did not believe her, and "the Tax Court, like any other court, 'may disregard uncontradicted testimony by

---

[5]Where the burden of production rests on a party, a court may, at its discretion, presume or infer from that party's failure to call a witness that the testimony the witness would have offered would not favor that party. *See, e.g.*, *Underwriters Labs. Inc. v. NLRB*, 147 F.3d 1048, 1054 (9th Cir. 1998); *Simon v. Comm'r*, 830 F.2d 499, 506 (3d Cir. 1987); *Wichita Terminal Elevator Co. v. Comm'r*, 6 T.C. 1158, 1165 (1946), *aff'd*, 164 F.2d 513 (10th Cir. 1947).

a taxpayer where it finds that testimony lacking in credibility.' " *Conti v. Comm'r*, 39 F.3d 658, 664 (6th Cir. 1994) (quoting *Lerch v. Comm'r*, 877 F.2d 624, 631 (7th Cir. 1994)); *see also Demkowicz v. Comm'r*, 551 F.2d 929, 931 (3d Cir. 1977) (holding the Tax Court "not bound to accept taxpayer's uncontradicted testimony if it found the testimony to be improbable, unreasonable, or questionable"); *Wood v. Comm'r*, 338 F.2d 602, 605 (9th Cir. 1964).

**[4]** Next, the Tax Court determined that, in reality, Sparkman was the sole owner of Mercury Solar PTO. The Tax Court was free to disregard the self-serving testimony of Sparkman and Porter, especially in the light of contradictory documentary evidence, consider Thompson's apparent admission that he was unaware that he had a share until the trial itself, and Sparkman's own testimony, in a prior unrelated proceeding, that he "believed" that he was the sole beneficiary of the trust.

**[5]** Finally, the Tax Court found that Sparkman failed to respect the trust form. The record reflects several inconsistencies in form: Porter was named "Trustee" rather than "Fiduciary Owner" (the position's title in Mercury Solar PTO's formation documents); the "Certificate Record" showing ownership of the trust is, by the parties' own admission, entirely false; and there are two proffered dates when Thompson was allegedly granted his one unit.

**[6]** In light of the cumulative weight of this evidence, we conclude that the Tax Court did not commit clear error in finding that Mercury Solar PTO lacks economic substance. We therefore affirm the Tax Court's decision with respect to self-employment taxes.[6]

---

[6]Sparkman also argues that the Tax Court erred by failing to classify Mercury Solar as a "business trust" within the meaning of Treas. Reg. § 301.7701-4(b), and hence as a partnership. Sparkman's argument fails because the question of whether an entity has economic substance neces-

### III.   The Tax Court's Exclusion of Sparkman's 1996 and 1997 Amended Returns

During his direct examination, Sparkman attempted to enter his 1997 and 2000 amended returns into evidence, which he had filed with the IRS shortly before trial. The Tax Court rejected them as not probative. The Tax Court's evidentiary rulings are reviewed for abuse of discretion and will not be reversed absent a showing of prejudice. *Sacks v. Comm'r*, 82 F.3d 918, 921 (9th Cir. 1996).

**[7]** A tax return, even though signed under penalty of perjury, is not per se evidence of the income, deductions, credits, and other items claimed therein. *Mays v. United States*, 763 F.2d 1295, 1297 (11th Cir. 1985); *Lunsford v. Comm'r*, 212 F.2d 878, 883 (5th Cir. 1954); *Wilkinson v. Comm'r*, 71 T.C. 633, 639 (1979)*; Halle v. Comm'r*, 7 T.C. 245, 247-50 (1946), *aff'd,* 175 F.2d 500 (2d Cir. 1949). As the Tax Court noted, Sparkman retained the opportunity to substantiate the contents of his returns with testimony and documentary evidence. Because Sparkman's amended returns did not "hav[e] any tendency to make the existence" of those underlying items "more probable or less probable than it would be without" them, Fed. R. Evid. 401, the Tax Court was correct in declining to admit the returns into evidence.

**[8]** Even if the returns were somehow relevant, however, the Tax Court did not abuse its discretion in refusing to admit them. Federal Rule of Evidence 403 allows even relevant evi-

sarily underlies how to classify that entity. *Cf. Lerman v. Comm'r*, 939 F.2d 44, 52 (3d Cir. 1991) ("Economic substance is a *prerequisite* to the application of any Code provisions allowing deductions."). By definition, to be a "business entity" (and hence a business trust), an entity must be an "entity recognized for federal tax purposes." Treas. Reg. § 301.7701-2(a). An entity without economic substance, whether a sham partnership or a sham trust, is a sham either way and hence is not recognized for federal tax law purposes.

dence to be excluded if its admission would result in "need-less presentation of cumulative evidence." In this case, an amended tax return filed only a few days before trial merely demonstrates that Sparkman now contends he had a different level of income than was reflected on his original return—a contention that Sparkman presented in oral testimony immediately after the returns were rejected. Sparkman has not demonstrated what the returns would have added to his own testimony that same day. Because the returns were at best cumulative, and at worst irrelevant, we hold that the Tax Court did not abuse its discretion in declining to accept them into evidence.

## IV. Attribution of HECO Payments

Among the parties' pre-trial stipulations was the following:

> 8. For the year 1999, Hawaiian Electric Company (HECO) issued a Form 1099, Non-Employee Compensation, to Mercury Solar in the amount of $195,275. The statutory notices issued to Sparkman and Mercury Solar both contain an adjustment in the amount of $195,275 labeled "1099 NEC" that is based on the Form 1099 issued by HECO.

At trial, Sparkman contradicted this stipulation and claimed that he never received the form. He conceded, however, that HECO did make those payments, and contended only that $113,354 of those payments should be attributed to HEH, not to Mercury Solar PTO. He renews his objection on appeal.

Sparkman argues that the Tax Court incorrectly treated the stipulation as an admission that the HECO payments were attributable to Sparkman. But the Tax Court based its attribution of the payments not on an admission in the stipulation, but rather on basic assignment-of-income principles and Sparkman's own admission in testimony. Whether assignment-of-income principles apply is a mixed question of

fact and law. Mixed questions are reviewed *de novo* unless the question is primarily factual. *Hood v. Encinitas Union Sch. Dist.,* 486 F.3d 1099, 1104 (9th Cir. 2007).

**[9]** Under assignment-of-income principles, "income must be taxed to him who earns it." *Comm'r v. Culbertson*, 337 U.S. 733, 739-40 (1940); *see also Lucas v. Earl*, 281 U.S. 111 (1930). Sparkman was clear in his testimony that it was *Mercury Solar*, as the installing contractor, which earned the money, even if HEH received some of it. He stated that "I do know that Mercury Solar in *its* transaction with [HECO] wanted to be paid faster" and that "*Mercury* submitted invoices that *it was owed* by [HECO] to" the factor for payment (emphases added). Instead, "apparently mid-1999 . . . the funds [were] directed into the Hawaii Environmental Holdings account instead of the Mercury Solar account." Sparkman has pointed to no evidence in the record that contradicts this interpretation of his testimony—that the money was *earned* by Mercury Solar, and the proceeds merely *directed* to HEH.

**[10]** No matter where the funds are "directed," they are taxed where they are earned. *Kochansky v. Comm'r*, 92 F.3d 957, 958 (9th Cir. 1996). Any attempt to reattribute income through redirection of payments by a factor can only be described as an "arrangement by which the fruits are attributed to a different tree from that on which they grew," and disregarded for income tax purposes. *Lucas*, 281 U.S. at 114.[7] For this reason, we affirm the Tax Court's holding that the entire HECO payment should be attributed to Mercury Solar PTO, and hence to Sparkman.

---

[7]Sparkman now contends that his assignment of the income from the HECO rebates constituted a "transfer of property rights." Such an arrangement also makes assignment-of-income principles no less relevant: one can no more escape taxation by assigning the gain from the sale of property than one can by assigning income from services.

## V.  Tax Court's Calculation of 1996 and 1997 Income

Before trial, the Commissioner stipulated that Sparkman's income from Mercury Solar PTO for 1996 and 1997 "did not exceed" $74,985 and $70,062, respectively, figures drawn from Sparkman's original income tax returns. Sparkman now contends that these returns were in error, that a portion of each is properly characterized as a "return of principal," and that the real amounts of income, reflected on Mercury Solar PTO's amended form K-1 for those years, are $45,788 and $54,727, respectively.

**[11]** The Commissioner contends that Sparkman failed to raise this issue properly in the Tax Court below. Absent exceptional circumstances, this court will not consider an argument that was not first raised in the Tax Court. *Comm'r v. Ewing*, 439 F.3d 1009, 1014 (9th Cir. 2006); *Monetary II Ltd. P'ship v. Comm'r*, 47 F.3d 342, 347 (9th Cir. 1995). "Generally, in order for an argument to be considered on appeal, the argument must have been raised sufficiently for the trial court to rule on it." *A-1 Ambulance Serv., Inc. v. County of Monterey*, 90 F.3d 333, 338 (9th Cir. 1996).

The only reference to this alleged bookkeeping error in the Tax Court came in Sparkman's testimony, when he testified:

> A: Well, one of the major problems Mercury Solar has had is finding a competent accountant, bookkeeper and CPA. And these initial years they reported repayment of my principal as income that I put into Mercury Solar. And in preparing for the audit . . . this mistake was found. And it was corrected to reflect my actual income as separate from my return of principal. So they reduced my distribution from Mercury Solar from I don't know what it was originally but it was 70, something 70,000 to 45,000.

. . .

Q:   Okay. Well, have you likewise had to amend
     your tax returns?

A:   Yes, I had to. I had to amend my 1996, '97 and
     '98 returns to reflect the change in the income.

No reference to the error, or any required adjustment from the
sum the Commissioner sought, appeared in Sparkman's open-
ing or answering briefs to the Tax Court. The only other men-
tion of this adjustment in income appears in Sparkman's
Computation for Entry of Decision filed pursuant to Tax Ct.
R. 155:[8]

> Sparkman's 1996 (Ex 64-P) and 1997 (Ex 67-P) tax
> returns were amended to comply with the Mercury
> amended 1996 (Ex 12-J) and 1997 (Ex 13-J) tax
> returns that was [sic] filed in September 2003 and
> based upon the amended K-1 issued to Sparkman for
> those years.

In that filing, Sparkman made no reference to his testimony
regarding the reason for the amendment.

[12] On these facts, we hold that Sparkman did not prop-
erly raise this issue before the Tax Court. Because Sparkman
failed to raise this matter in his briefs to the Tax Court, and
made only one reference to it in testimony, it is difficult to see
how that court could have ruled on it.[9] This circuit has held

---

[8]Tax Court Rule 155(b) allows litigants to "file with the Court a compu-
tation of the deficiency, liability, or overpayment believed by such party
to be in accordance with the Court's findings and conclusions." The Tax
Court has held that this rule "does not *allow* arguments as to any other
issues *beyond the issues litigated* in respect of the ultimate bottom-line
deficiency, liability, or overpayment for the years at issue." *Bankamerica
Corp. v. Comm'r*, 109 T.C. 1, 10 (1997) (second emphasis added).

[9]Even if Sparkman's reference to his 1996 and 1997 returns contained
in his Rule 155 Recalculation filing had been more specific, it would have

that it may, at its discretion, hear appeals on issues not raised before the Tax Court if the issue "is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *Bolker v. Comm'r*, 760 F.2d 1039, 1042 (9th Cir. 1985). In this case, however, the record is far from developed—we can only guess what led to the recalculation by Sparkman and his accountants, or the precise character of the "return of principal" (proceeds from sale of assets? Repayment of loan principal?) that his accountants are supposed to have discovered.[10] Because Sparkman did not properly address the issue before the Tax Court, we deem the issue waived.

## VI.    Unsubstantiated Deductions

"[A]n income tax deduction is a matter of legislative grace and . . . the burden of clearly showing the right to the claimed deduction is on the taxpayer." *New Colonial Ice Co. v. Helvering*, 292 US 435, 440 (1934); *Boyd Gaming Corp. v. Comm'r*, 177 F.3d 1096, 1098 (9th Cir. 1999). Taxpayers are required to keep sufficient records to substantiate deductions. I.R.C. § 6001; Treas. Reg. § 1.6001-1(a). This Court reviews for clear error the Tax Court's factual determination that a taxpayer has failed to produce sufficient evidence to substantiate a deduction. *Maciel v. Comm'r*, 489 F.3d 1018, 1028 (9th Cir. 2007).

### A.    *Depreciation Deductions from HEH*

[13] The Commissioner disallowed in full the depreciation losses, allegedly attributable to depreciating solar water heat-

---

been too late to litigate the question. "Ordinarily, arguments not timely presented are deemed waived." *Boardman v. Estelle*, 957 F.2d 1523, 1535 (9th Cir. 1992).

[10]Needless to say, the Commissioner had no opportunity to respond to any such arguments.

ing equipment, that HEH had allocated to Sparkman on his Schedules K-1. The Tax Court agreed, stating that the "only evidence introduced at trial in support of the claimed HEH losses consists of self-serving figures listed in the HEH returns (prepared, signed, and filed by Sparkman less than 3 weeks before trial) . . . , and Sparkman's returns for the years at issue," which the Tax Court declined to accept because they were not credible. The only other document in the record cited by Sparkman is a document, produced by HEH and given to HEH's "beneficiary"-customers, purporting to allocate to them a portion of the cost of the equipment as a tax credit, similar to schemes rejected by the Tax Court in *Hvidding*, T.C. Memo 2003-151, and *Richter*, T.C. Memo. 2002-90. The Tax Court did not commit clear error in declining to accept such a document at face value.

**[14]** Sparkman now contends that, instead of disallowing the losses in full, the Tax Court ought to have approximated the correct amount of the depreciation losses. Sparkman cites *Cohan v. Comm'r*, 39 F.2d 540 (2d Cir. 1930), to support his contention.[11] This circuit's precedents adopting the *Cohan* rule, however, are clear that the rule does not obviate the need for *some* proof of entitlement to a deduction in the first place. The finding of the Tax Court that Sparkman failed to establish such an entitlement eliminates the requirement that the Tax Court estimate what those losses were. *See Edelson v. Comm'r*, 829 F.2d 828, 831 (9th Cir. 1987) (summarizing *Cohan* as standing for the proposition that "a court should allow the taxpayer some deductions if the taxpayer *proves he is entitled to the deduction* but cannot *establish the full amount* claimed" (emphasis added)); *see also Norgaard v. Comm'r*, 939 F.2d 874, 879 (9th Cir. 1991) (noting that,

---

[11]In *Cohan*, the taxpayer, a theater producer, was unable to substantiate his entertainment deductions, and the Commissioner sought to disallow them entirely. The circuit court reversed, ordering that "the Board should make as close an approximation as it can" of the losses to which Cohan was entitled. 39 F.2d at 543.

under the *Cohan* rule, the trial court "may not be compelled to guess or estimate . . . even though such an estimate, if made, might have been affirmed").

Reviewing the evidence does not give the panel "the definite and firm conviction that a mistake has been committed," *Wolf*, 4 F.3d at 712, required to reverse the Tax Court under the clear error standard.

## B.    *Charitable Donation Deductions*

Sparkman claims that he is entitled to additional deductions, arising out of charitable donations made in 1997 and 2000, which he did not claim on his original tax returns for that year. He testified that he intentionally did not claim all the charitable deductions he was entitled to because the depreciation deductions he was claiming through HEH had reduced his adjusted gross income such that he could not take the full amount of charitable deductions. *See* I.R.C. § 170(b)(1) (limiting the charitable contribution deduction to 50% of the taxpayer's adjusted gross income). If his depreciation deductions are disallowed, and his adjusted gross income correspondingly increased, he argues in the alternative that he should be allowed the charitable deductions.

The record contains five receipts from charitable organizations. Four are from United States IAS Members' Trust, acknowledging donations made in the years 1997 to 2000. The third is from the Church of Scientology, acknowledging a donation made in 2000. All are addressed to Sparkman. As Sparkman himself admitted in testimony, however, in the past he had donated to these organizations personally, through Mercury Solar PTO, and through HEH—but the receipts were always sent to Sparkman. Sparkman contends that the 1997 and 2000 donations should be attributed to him personally, but that the 1998 and 1999 donations were properly attributable to HEH.

**[15]** Sparkman has produced no evidence that the funds referred to in any of these receipts were drawn on his personal funds, as opposed to HEH's, apart from his own testimonial insistence that "the ones I have claimed are definitely attributable to me." Neither the Commissioner nor the Tax Court was required to accept Sparkman's testimony as a substitute for the documentary substantiation I.R.C. § 6001 requires.

**[16]** For these reasons, we hold that the Tax Court did not commit plain error in finding that Sparkman has failed to substantiate his depreciation and charitable deductions.

## VII.   § 6662 Negligent Underpayment Penalty

**[17]** I.R.C. § 6662 imposes a 20% penalty on any portion of an underpayment of tax that is attributable to, *inter alia*, "[n]egligence or disregard of rules or regulations." I.R.C. § 6662(b)(1). "Negligence" is defined as "any failure to make a reasonable attempt to comply with the provisions" of the Internal Revenue Code. I.R.C. § 6662(c). The Commissioner's determination of a penalty is presumptively correct, and the taxpayer has the burden of proving that his underpayment was not the result of negligence or disregard. *Pahl v. Comm'r*, 150 F.3d 1124, 1131 (9th Cir. 1998). The Tax Court's determination on a negligence penalty is reviewed for clear error. *Wolf,* 4 F.3d at 715 (9th Cir. 1993).

**[18]** While it is a defense to show that there "was a reasonable cause for such [underpayment] and that the taxpayer acted in good faith," I.R.C. § 6664(c)(1), Sparkman does not seek refuge in the good faith exception in his appeal. Rather, he contends simply that his "returns were not inaccurate in any way," and that there was no underpayment to penalize. Having affirmed the Tax Court's determination that there was a substantial underpayment of taxes, we uphold as well the Tax Court's imposition of § 6662 penalties.

AFFIRMED.